1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
9                                     AT SEATTLE

10   DEREK STENSON,                              CASE NO. C23-1316 MJP

11                     Plaintiff,                ORDER ON MOTION TO DISMISS

12          v.

13   KING COUNTY, et al.,

14                     Defendants.

15

16          This matter comes before the Court on Defendants' Motion to Dismiss. (Dkt. No. 18.)

17   Having reviewed the Motion, Plaintiff's Opposition (Dkt. No.  20), the Reply (Dkt. No. 21), and

18   all supporting materials, the Court GRANTS in part and DENIES in part the Motion.

19                                   **BACKGROUND**

20          This action arises out of King County Sheriff's Deputy Jacob Leenstra's decision to

21   shoot and kill Joshua Ross Sarrett outside Sarrett's home without warning on September 19,

22   2020, while Sarrett was unarmed, intoxicated, and was only suspected of being a harm to

23   himself. Derek Stenson, as personal representative for Sarrett's estate, brings Fourth and

24

1   Fourteenth Amendment claims under 42 U.S.C. § 1983, and state law claims against Leenstra,

2   Leenstra's marital community, and King County. The Court reviews Defendants' request for

3   judicial notice and then summarizes the pertinent allegations.

4   **A.      Judicial Notice**

5          Though Defendants have moved to dismiss the Complaint under Rule 12(c), both Parties

6   agree that the Court should take judicial notice of the facts alleged in a complaint for damages

7   that Sarrett's sister, Chantal Capps, filed in King County Superior Court. (Complaint for

8   Damages filed by Chantal Capps ¶ 4.1 ("Capps Compl.") (filed as Ex. 1 to the Declaration of

9   Santiago Villanueva (Dkt. No. 19-1).) Given the Parties' agreement, the Court takes judicial

10  notice of the factual allegations in the Capps Complaint and reviews them as if they are

11  allegations contained in the Complaint Stenson has filed.

12  **B.      Factual Allegations**

13         On September 19, 2020, Sarrett was at his home in Auburn, Washington with his sisters,

14  Chantal Capps and Amanda Hayes, and his girlfriend Taylor Nystrom. (Amended Complaint ¶

15  3.2 ("Compl.") (Dkt. No. 4).) Sarrett had been drinking heavily while experiencing a mental

16  health crisis. (See Capps Compl. ¶ 4.1.) Sarrett's sisters feared he might attempt suicide, and so

17  they flagged down Deputy Leenstra who was driving by in his marked Sheriff's Office vehicle

18  at 3:00 PM. (Capps Compl. ¶ 4.2; Compl. ¶ 3.3.) Leenstra exited his vehicle, and the sisters

19  informed Leenstra that Sarrett was very intoxicated and that he had struck Nystrom the week

20  before. (Capps Compl. ¶ 4.3; Compl. ¶ 3.4.) The sisters did not tell Leenstra that Sarrett had been

21  violent towards anyone that day, and instead told them their concern he was suicidal. (Capps

22  Compl. ¶ 4.2.) Leenstra asked whether Sarrett had a firearm, and the sisters told him that

23

24

although Sarrett had a firearm, they did not know if he had it on his person. (Capps Compl. ¶ 4.4.)

Leenstra attempted to contact Sarrett and Nystrom, but they both retreated into the house. (Capps Compl. ¶ 4.5.) Leenstra drew his firearm and positioned himself behind his patrol vehicle and instructed Capps, Haynes, and a neighbor to stay behind the car. (Capps Compl. ¶ 4.5.) Leenstra called for backup and was informed that backup was en route by 3:06 PM—six minutes after he had arrived. (Capps. Compl. ¶ 46.) Sarrett then exited the house in response to Leenstra's demands. (Capps Compl. ¶ 4.7; Compl. ¶ 3.5.) The Complaint in this case states that Leenstra and Sarrett had an "exchange of words that lasted mere minutes," while the Capps Complaint states that Sarrett refused to talk to Leenstra. (Compare Compl. ¶ 3.5 with Capps Compl. ¶ 4.7.) As alleged in the Capps Complaint, Leenstra asked Sarrett to remove his hands from his pocket, and Sarrett "attempt[ed] to remove the items from his pockets to show he was unarmed" and "also told Deputy Leenstra he did not have a gun." (Capps. Compl. ¶ 4.7.) Sarrett alleges that Leenstra was positioned more than 55 feet away from Sarrett while the two interacted. (Compl. ¶ 3.7.) The Capps Complaint states that "Leenstra ordered Sarrett to keep his hands out of his pockets one or two times before Deputy Leenstra fired his gun at Mr. Sarrett, at approximately 3:08 pm." (Capps Compl. ¶ 4.8.) Without giving any warning, Deputy Leenstra fired once, followed by a brief pause, and then fired three more times. (Id.) According to the Complaint in this action, the first bullet struck Sarrett in the chest and the following three bullets struck his back as he fell to the ground. (Compl. ¶ 3.5.) Sarrett did not have a gun on his person or any object in his hands that resembled a weapon. (Compl. ¶ 3.6.) Sarrett also "made no threatening gestures or sudden movements with a weapon that could reasonably be interpreted as

1  threatening." (Id.) And "[n]o weapons were visible in the yard or anywhere within reach of"

2  Sarrett. (Id.)

3       After he shot Sarrett, Leenstra then approached and handcuffed Sarrett prior to providing

4  any first aid or requesting medical aid. (Compl. ¶ 3.8.) Sarrett was pronounced dead at 3:35 PM,

5  roughly 27 minutes after being shot.

6       As personal representative to Sarrett's estate, Stenson pursues eight claims against King

7  County, Leenstra and Leenstra's marital estate: (1) a claim under § 1983 for unreasonable search

8  and seizure in violation of the Fourth Amendment; (2) a claim under § 1983 for excessive force

9  in violation of the Fourth Amendment; (3) a claim under § 1983 for denying substantive due

10 process in violation of the Fourteenth Amendment; (4) negligence; (5) false arrest and false

11 imprisonment; (6) battery; (7) negligent infliction of emotional distress; and (8) wrongful

12 death/survivorship.

13                               **ANALYSIS**

14 **A.    Legal Standard**

15      Defendants move for dismissal under Fed. R. Civ. P. 12(c). The standard governing a

16 Rule 12(c) motion for judgment on the pleadings is "functionally identical" to that governing a

17 Rule 12(b)(6) motion. United States ex rel. Caffaso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d

18 1047, 1054 n.4 (9th Cir. 2011). Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a

19 complaint for "failure to state a claim upon which relief can be granted." In ruling on a motion to

20 dismiss, the Court must construe the complaint in the light most favorable to the non-moving

21 party and accept all well-pleaded allegations of material fact as true. Livid Holdings Ltd. v.

22 Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005); Wyler Summit P'ship v. Turner

23 Broad. Sys., 135 F.3d 658, 661 (9th Cir. 1998). Dismissal is appropriate only where a complaint

24

1  fails to allege "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp.</u>

2  <u>v. Twombly</u>, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff

3  pleads factual content that allows the court to draw the reasonable inference that the defendant is

4  liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

5  **B.      No § 1983 Claims Against King County**

6        Stenson alleges that King County is vicariously liable for the acts of Leenstra that form

7  the basis of three § 1983 claims. This theory has no merit.

8        It is black letter law that "a municipality cannot be held liable under § 1983 on a

9  respondeat superior theory." <u>Monell v. Dep't of Soc. Servs. of City of N.Y.</u>, 436 U.S. 658, 691

10  (1978). A municipality may be liable if the plaintiff suffered a constitutional tort "pursuant to

11  official municipal policy." <u>Id.</u> And a municipality can be liable for an isolated constitutional

12  violation if a final policymaker "ratified" a subordinate's actions. <u>Sabra v. Maricopa Cnty. Cmty.</u>

13  <u>Coll. Dist.</u>, 44 F.4th 867, 885 (9th Cir. 2022).

14        Stenson's vicarious liability allegations in support of his § 1983 claims fail as a matter of

15  law. First, the allegations run contrary to well-established law that a municipality cannot be held

16  vicariously liable. <u>See</u> <u>Monell</u>, 436 U.S. at 691. Second, Stenson includes no allegations that an

17  official policy caused the constitutional torts or that a policymaker ratified Leenstra's actions. As

18  such, the § 1983 claims he alleges against King County must be dismissed.

19        Separately, the Court notes that Stenson incorrectly argues that King County has waived

20  immunity for § 1983 claims through RCW 4.96.010. This argument has no merit. The state law

21  Plaintiff cites provides that local government entities "shall be liable for damages arising out of

22  their tortious conduct, or the tortious conduct of their past or present officers, employees, or

23  volunteers while performing or in good faith purporting to perform their official duties, to the

24

1   same extent as if they were a private person or corporation." RCW 4.96.010(1). This law does

2   not function as a waiver of Washington's Eleventh Amendment protection from being sued

3   under 42 U.S.C. § 1983. <u>See</u> <u>Edgar v. State</u>, 92 Wn.2d 217 (1979); <u>see also</u> <u>Tobin v.</u>

4   <u>Washington</u>, No. C08-5591 RJB/JRC, 2009 WL 1357222, at *6 (W.D. Wash. May 11, 2009).

5   The state law functions only to allow state law claims, not § 1983 claims, against a local

6   governmental entity. Stenson cites not contrary authority and the Court rejects the argument.

7       The Court GRANTS the Motion as to King County and DISMISSES the § 1983 claims

8   alleged against it.

9   **C.     Stenson Alleges Valid § 1983 Claims Against Leenstra**

10      Plaintiff pursues three § 1983 claims against Leenstra: (1) unreasonable search and search

11  seizure in violation of the Fourth Amendment; (2) excessive use of force in violation of the

12  Fourth Amendment; and (3) denial of substantive due process under the Fourteenth Amendment.

13  Defendants do not challenge the sufficiency of the alleged constitutional deprivations. Instead,

14  they argue that Leenstra is entitled to qualified immunity on all three claims. Before addressing

15  qualified immunity, the Court addresses the question of whether Stenson has alleged sufficient

16  facts to support all three claims.

17      **1.      Unreasonable Search and Seizure Claim**

18      Stenson has stated a claim that Leenstra was not justified in shooting and placing Sarrett

19  in handcuffs without probable cause.

20      The Fourth Amendment protects "against unreasonable searches and seizures." U.S.

21  Const. amend IV.  "A 'seizure' triggering the Fourth Amendment's protections occurs only when

22  government actors have, 'by means of physical force or show of authority, . . . in some way

23  restrained the liberty of a citizen.'" <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989) (omissions

24

1   in original) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968)). This may occur through

2   coercion, physical force, or a show of authority. <u>United States v. Chan-Jimenez</u>, 125 F.3d 1324,

3   1326 (9th Cir. 1997). The general rule is that "a person has been 'seized' within the meaning of

4   the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a

5   reasonable person would have believed that he was not free to leave." <u>United States v.</u>

6   <u>Mendenhall</u>, 446 U.S. 544, 554 (1980).  In addition, a seizure "requires either physical force …

7   or, where that is absent, submission to the assertion of authority."  <u>California v. Hodari D.</u>, 499

8   U.S. 621, 626 (1991); <u>see also</u> <u>United States v. McClendon</u>, 713 F.3d 1211, 1215 (9th Cir. 2013).

9        In determining whether a reasonable person would have felt free to ignore police

10  presence, the Ninth Circuit considers five factors:  "(1) the number of officers; (2) whether

11  weapons were displayed; (3) whether the encounter occurred in a public or nonpublic setting; (4)

12  whether the officer's officious or authoritative manner would imply that compliance would be

13  compelled; and (5) whether the officers advised the detainee of his right to terminate the

14  encounter."  <u>United States v. Brown</u>, 563 F.3d 410, 415 (9th Cir. 2009) (quoting <u>United States v.</u>

15  <u>Washington</u>, 387 F.3d 1060, 1068 (9th Cir. 2004)).

16        Stenson has adequately alleged a Fourth Amendment claim arising out of Leenstra's

17  decision to shoot and handcuff Sarrett. The Complaint plainly alleges that Sarrett was seized by

18  Leenstra when he shot and handcuffed him. (<u>See</u> Compl. ¶ 4.2.) Stenson adequately alleges that

19  Leenstra's decision to seize Sarrett was unreasonable given that: (1) Leenstra was not

20  investigating any crime—he was only investigating the sisters' fear Sarrett might harm himself;

21  (2) Sarrett did not refuse to comply with any order—he was attempting to remove his hands from

22  his pockets in compliance with Leenstra's order when Leenstra shot him; (3) Sarrett was not

23  armed and he told Leenstra he was not armed; (4) Leenstra did not ask Sarrett if he was armed;

24

(5) Sarrett was not threatening anyone; (6) no weapons were nearby and Sarrett made no threatening gestures; and (7) no bystanders were next to or in close proximity to Sarrett. These facts suffice to state a claim. The Court notes, too, that Defendants do not specifically challenge the adequacy of these allegations. Regardless, the Court finds the claim adequately pleaded.

### 2.      Excessive Use of Force Claim

Stenson provides sufficient allegations to support his excessive force claim

The touchstone in evaluating an officer's use of force is objective reasonableness. See Graham v. Connor, 490 U.S. 386, 397 (1989) (citing Scott v. United States, 436 U.S. 128, 137–39 (1978)). The reasonableness standard "nearly always requires a jury to sift through disputed factual contentions," so summary judgment in an excessive-force case "should be granted sparingly." Torres v. City of Madera, 648 F.3d 1119, 1125 (9th Cir. 2011) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)). The reasonableness of the officer's conduct is assessed by balancing the "nature and quality of the intrusion" on the plaintiff's Fourth Amendment rights against the government's countervailing interest in the force used. Graham, 490 U.S. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). "Deadly force is the most severe intrusion on Fourth Amendment interests because an individual has a 'fundamental interest in his own life' and because, once deceased, an individual can no longer stand trial to have his 'guilt and punishment' determined." Est. of Aguirre v. Cnty. of Riverside, 29 F.4th 624, 628 (9th Cir.), cert. denied sub nom. Cnty. of Riverside, California v. Est. of Clemente Najera-Aguirre, 143 S. Ct. 426, 214 L. Ed. 2d 234 (2022) (quoting Garner, 471 U.S. at 9). "Before using deadly force, law enforcement must, 'where feasible,' issue a warning." Id. (quoting Garner, 471 U.S. at 11–12.

1   Three factors inform the Court's analysis of the government's countervailing interest in

2   the level of force used: "(1) the level of immediate threat [Sarrett] posed to the officer or others,

3   (2) whether [Sarrett] was 'actively resisting arrest or attempting to evade arrest by flight,' and (3)

4   'the severity of the crime at issue.'" Aguirre, 29 F.4th at 628 (quoting Graham, 490 U.S. at 396).

5   "[t]he 'most important' Graham factor . . . [is] the level of threat [Sarrett] posed immediately

6   before his death." Id. (quoting Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).

7   Based on the allegations in the Complaint and the Capps Complaint, Stenson adequately

8   alleges the use of force was unreasonable. The use of deadly force is indisputably a severe

9   intrusion on Sarrett's fundamental right to live. Against this interest, there are few facts that

10  might support the countervailing interest in the use of deadly force. First, there are no allegations

11  suggesting Leenstra was threatened. Although Leenstra had been told Sarrett owned a gun,

12  Sarrett told Leenstra he had no gun, Leenstra failed to ask Sarrett if he was armed, Sarrett had no

13  weapon on his person or nearby, and Sarrett made no threatening gestures to reach for a weapon.

14  Sarrett was also over 50 feet away from Leenstra and the other bystanders, save for Nystrom

15  who is not alleged to have been close to Sarrett at the time of the shooting. Second, Sarrett was

16  attempting to comply with Leenstra's demand to remove his hands from his pockets when he

17  was shot and had not attempted flight. (Capps Compl. ¶ 4.7.) Sarrett had therefore complied with

18  the officer's demands. And Leenstra did not warn Sarrett he was being placed under arrest and

19  did not warn Sarrett he was going to shoot. Third, accepting the facts as true, Sarrett was not

20  suspected of committing any crime. Indeed, the primary reason Leenstra was summoned to the

21  home was to ensure Sarrett did not harm himself, not others. And while Leenstra may have

22  known Sarrett had assaulted his girlfriend the week before, there was nothing suggesting Sarrett

23  was a threat to his girlfriend at the time of the shooting. At most, Leenstra argues Sarrett was

24

1    resisting arrest by not taking his hands out of his pocket. But the allegations in the Capps

2    Complaint directly refute this argument because it alleges Sarrett was attempting to show

3    Leenstra the contents of his pockets in response to the demand. (Capps Compl. ¶ 4.7.) On

4    balance, and placing the greatest weight on the first factor, the Court finds that the countervailing

5    governmental interests do not justify the use of deadly force. Accordingly, the Court finds this

6    claim adequately pleaded.

7        **3.      Fourteenth Amendment Claim**

8        Stenson alleges a Fourteenth Amendment "Substantive Due Process" claim that the

9    Complaint does not clearly define. On the one hand, Stenson alleges that Leenstra's use of

10   deadly force and "other undiscovered conduct" deprived Sarrett of substantive due process.

11   (Complaint ¶¶ 6.3-6.4.) On the other hand, Stenson alleges that Leenstra's use of deadly force

12   "depriv[ed Sarrett] of his constitutional right to a familial relationship with his minor children"

13   and that the use of force "shocks the conscience." (Id.) Stenson alleges that as a result of

14   Leenstra's acts Sarrett's estate has "been injured in body and mind with the loss of life-long love,

15   companionship, comfort, support, society and care of the DECEDENT, and will continue to be

16   deprived for the remainder of their natural lives." (Compl. ¶ 6.5.) From these allegations, on

17   which Stenson does not elaborate in his response to the Motion, it appears that Stenson pursues a

18   substantive due process claim of impermissible interference with familial association. The Court

19   reviews the claim under this lens and finds the allegations sufficient to sustain it.

20       A substantive due process claim of impermissible interference with familial association

21   arises when a state official harms a parent or child in a manner that shocks the conscience. Porter

22   v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008). "[O]nly official conduct that 'shocks the

23   conscience' is cognizable as a due process violation." Id. (quoting Cnty. of Sacramento v. Lewis,

24

523 U.S. 833, 846 (1998)). Such a claim is distinct from a claim arising under the Fourth

Amendment, with a Fourteenth Amendment requiring proof that defendant's acts "shocks the

conscience." Ochoa v. City of Mesa, 26 F.4th 1050, 1056 (9th Cir. 2022); see Lewis, 523 U.S. at

843. "There are two tests used to decide whether officers' conduct 'shocks the conscience.'"

Ochoa, 26 F.4th at 1056. A state official's conduct may shock the conscience if (1) the official

acted with a "purpose to harm" the victim for reasons unrelated to legitimate law enforcement

objectives; or (2) the official acted with "deliberate indifference" to the victim. Porter, 546 F.3d

at 1137.  When events happen quickly and the officer makes a snap judgment, the plaintiff must

show the officer acted with a "purpose to harm." Id.

The "purpose to harm" standard recognizes that not every harm shows a harmful purpose

that shocks the conscience. For example, the Ninth Circuit applied the purpose to harm standard

to a familial association claim brought by the surviving relatives of a suspect who was fatally

shot after he took a step towards officers while carrying a knife. Ochoa, 26 F.4th at 1056. But the

Ninth Circuit has also found an officer could have acted with purpose to harm when he shot

twelve rounds at an occupied vehicle even though the car posed no immediate threat. See A.D. v.

Cal. Highway Patrol, 712 F.3d 446, 458 (9th Cir. 2013). When the officer has time to make

"unhurried judgments," then we assess the officer's actions under the "deliberate indifference"

standard. Lewis, 523 U.S. at 851. When officials have "time to make unhurried judgments," and

"extended opportunities to do better," but unreasonably allow harm to occur, then their

"protracted failure even to care" can shock the conscience, thus giving rise to a substantive due

process claim. Id. For a defendant to act with deliberate indifference, he must "recognize the

unreasonable risk and actually intend to expose the [victim] to such risks without regard to the

consequences to the [victim]." Herrera v. Los Angeles Unified Sch. Dist., 18 F.4th 1156, 1158

1  (9th Cir. 2021) (internal quotation marks and brackets omitted). This is therefore a subjective

2  standard.

3    Stenson has sufficiently alleged a substantive due process claim for the interference with

4  familial association. Accepting the allegations as pleaded, the Court finds that because Leenstra

5  had time to deliberate, the "deliberate indifference" standard applies. As alleged, Leenstra

6  sufficient time to deliberate and make an unhurried judgment given that he had already called for

7  back-up, there was no immediate threat to him or any other bystander, and he was positioned

8  over 50 feet away from Sarrett. Given these allegations, the Court finds that the "deliberate

9  indifference" standard should apply to its review of the allegations. And under this standard, the

10  Court finds the allegations sufficient to show Leenstra acted with deliberate indifference. A jury

11  could well find that Leenstra's decision to shoot without warning an unarmed man who was

12  identified only as a risk to himself, and who posed no harm to anyone shocks the conscience

13  such that Leenstra acted with deliberate indifference to Sarrett's wellbeing. And while the Court

14  understands that Leenstra believes Sarrett was reaching for a weapon in his pocket, the Court

15  accepts the allegations that Sarrett was actually attempting to comply with Leenstra's demand to

16  remove his hands and that he was given inadequate time to comply. As such, the Court finds the

17  allegations suffice to state a claim.

18    Even if the Court applies the more strenuous "purpose to harm" standard, the Court finds

19  the claim adequately pleaded. Accepting the allegations in the Complaint as true, there is

20  evidence suggesting that Leenstra acted with a purpose to harm because Sarrett posed no danger

21  to him or others, was unarmed and made no movement to go for a weapon, and had told Leenstra

22  he was unarmed. Leenstra was also not investigating any crime and Sarrett had not disobeyed

23

24

1   any orders. A jury could well construe these allegations as sufficient to show a purpose to harm.

2   The Court finds this claim adequately pleaded.

3   **D.      Leenstra is Not Entitled to Qualified Immunity**

4          The Court finds that Leenstra is not entitled to qualified immunity on any of the § 1983

5   claims.

6          **1.      Legal Standard**

7          Qualified immunity protects government officials "from liability for civil damages

8   insofar as their conduct does not violate clearly established statutory or constitutional rights of

9   which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

10  It protects government officials "unless (1) they violated a federal statutory or constitutional

11  right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of

12  Columbia v. Wesby, 583 U.S. 48, 62–63 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664

13  (2012)). The Court may address either prong first, see Pearson v. Callahan, 555 U.S. 223, 236–

14  42 (2009), and "may exercise [its] discretion to resolve a case only on the second ground when

15  no clearly established law shows that the officers' conduct was unconstitutional," O'Doan v.

16  Sanford, 991 F.3d 1027, 1036 (9th Cir. 2021).

17         A right is clearly established when it is "sufficiently clear that every reasonable official

18  would have understood that what he is doing violates that right." Reichle, 566 U.S. at 664

19  (internal quotation marks and alterations omitted). There need not be "a case directly on point, so

20  long as the "existing precedent" "place[d] the statutory or constitutional question beyond

21  debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). "Such specificity is especially important

22  in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult

23  for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the

24

1   factual situation the officer confronts.'" <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015) (per curiam)

2   (alteration omitted) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001)).

3       "Cases 'cast at a high level of generality' are unlikely to establish rights with the requisite

4   specificity." <u>Waid v. Cnty. of Lyon</u>, 87 F.4th 383, 388 (9th Cir. 2023) (quoting <u>Brosseau v.</u>

5   <u>Haugen</u>, 543 U.S. 194, 199 (2004) (per curiam)). "While a case addressing general principles

6   may clearly establish a right in an obvious case, such obvious cases are rare." Id. (citation and

7   quotation omitted). "Instead, a clearly established right usually requires "controlling authority or

8   a robust consensus of cases of persuasive authority." <u>Id.</u> (quoting <u>Wesby</u>, 583 U.S. at 63). In

9   such cases, the plaintiff "must either explain why their case is obvious under existing general

10  principles or, more commonly, show specific cases that control or reflect a consensus of non-

11  binding authorities in similar situations." <u>Id.</u>

12      **2.**    **No Qualified Immunity for Excessive Force Claim**

13      The Parties dispute whether the law is clearly established that Leenstra acted in violation

14  of the Fourth Amendment by shooting Sarrett without warning shortly after demanding him to

15  remove his hands from his pockets. The Court finds that, as alleged, Leenstra's use of deadly

16  force violated clearly established law.

17      At the time of the incident, the law was sufficiently clear that Leenstra's use of deadly

18  force without warning violated the Constitution. In 2014, the Ninth Circuit explained quite

19  clearly that an officer may not shoot a suspect who is not actively reaching for a weapon. <u>See</u>

20  <u>Cruz v. City of Anaheim</u>, 765 F.3d 1076, 1077–79 (9th Cir. 2014). "<u>Cruz</u> establishe[d] that

21  officers may not fire at a suspect—even an armed suspect—absent some reason to believe that

22  the suspect will soon access or use the weapon." <u>Peck v. Montoya</u>, 51 F.4th 877, 888 (9th Cir.

23  2022). Well before the shooting here, the Ninth Circuit also made clear that an officer "may not

24

1    kill suspects simply because they are behaving erratically, nor may they 'kill suspects who do not

2    pose an immediate threat to their safety or to the safety of others simply because they are

3    armed." Id. at 887–88 (quoting Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997)).

4           The Ninth Circuit has also recognized more generally that "[d]eadly force is not justified

5    '[w]here the suspect poses no immediate threat to the officer and no threat to others.'" Aguirre,

6    29 F.4th at 629 (quoting Garner, 471 U.S. at 11). In Aguirre, decided after the facts at issue in

7    this case, the Ninth Circuit found this "general constitutional principle" applied "with obvious

8    clarity" to the facts presented, even without a more specific, analogous case. Id. In Aguirre, the

9    Ninth Circuit explained that this obviousness principle applied to the case before it because the

10   plaintiff "posed no immediate threat to [the officers] or others at the time of his death." Id. In

11   reaching this conclusion, the Court pointed out that two prior decisions that predate Sarrett's

12   shooting supported its rationale. First, in Hayes v. Cnty. of San Diego, the Court found that an

13   officer's use of deadly force was unreasonable when they fatally shot Hayes after encountering

14   him inside his girlfriend's home holding a large knife pointed tip-down and standing six to eight

15   feet away. 736 F.3d 1223, 1227–28 (9th Cir. 2013). The Court noted that Hayes was not

16   threatening the officers and was not evading arrest, and the officer provided no advance warning.

17   Id. at 1233-34. Second, the Aguirre Court cited George v. Morris, where the Ninth Circuit found

18   it was unreasonable for officers responding to a domestic disturbance call to fatally shoot a

19   suspect who emerged from his home onto his porch with his pistol pointed down. 736 F.3d 829,

20   832-33, 839 (9th Cir. 2013).

21          Construing the facts here in Stenson's favor, Leenstra violated clearly established law by

22   shooting Sarrett repeatedly without warning after Sarrett told Leenstra he was unarmed and

23   where Sarrett was not reaching for a weapon, threatening Leenstra, or evading arrest. Indeed, the

24

1    only reason Leenstra had been summoned to the scene was because Sarrett's sisters thought

2    Sarrett might harm himself, not others. So while Leenstra had been told Sarrett owned a gun,

3    there was no evidence Sarrett had a weapon on him or that he was a danger to anyone. Sarrett

4    himself told Leenstra he was unarmed and Leenstra then failed to ask Sarrett whether he had a

5    weapon on him. Sarrett also "made no threatening gestures or sudden movements with a weapon

6    that could reasonably be interpreted as threatening." (Compl. ¶ 3.6.) To the contrary, Sarrett was

7    "attempting to remove the items from his pockets to show he was unarmed." (Capps Compl. ¶

8    4.7.) And "[n]o weapons were visible in the yard or anywhere within reach of" Sarrett. (Compl. ¶

9    3.6.) Nor had Sarrett engaged in any menacing conduct or suggested that he was a harm to

10   anyone on the scene. Given these factual allegations, Leenstra violated clearly established law by

11   using deadly force without warning against a person who posed no immediate threat and who

12   was not reaching for a weapon. See Cruz, 765 F.3d at 1077–79. Leenstra is not entitled to

13   qualified immunity.

14          The Court remains unpersuaded by Leenstra's belief that the outcome in Waid v. Cnty. of

15   Lyon compels a finding of qualified immunity here. 87 F.4th 383, 389 (9th Cir. 2023). As

16   Leenstra describes Waid, the Court found officers entitled to qualified immunity for shooting a

17   domestic violence suspect who "used aggressive language with the officers, ignored an order

18   from the officers, and rushed towards them in a small and confined space." (MTD at 9.)

19   Leenstra' summary of the case highlights several key factual differences between this action and

20   Waid. Unlike the plaintiff in Waid who was suspected of "throwing" his wife around, Waid, 87

21   F.4th at 386, Sarrett was suspected only of being possibly suicidal. And while the plaintiff in

22   Waid charged at the officers in an internal hallway while hurling profanities, Waid, 87 F.4th at

23   386, Sarrett here was simply outside his home over 50 feet away from Leenstra trying to take his

24

1    hands out of his pockets as Leenstra ordered. The facts in <u>Waid</u> identify a suspect who posed an

2    imminent threat to the officers, while Sarrett here posed no immediate threat to Leenstra. The

3    glaring factual differences between the facts in these two cases renders Leenstra's reliance on

4    <u>Waid</u> misplaced.

5           Lastly, the Court rejects Leenstra's argument that the Court should ignore <u>Hayes</u> and

6    <u>George</u> because they embraced the "obviousness principle" that should apply in rare

7    circumstances where the constitutional violation is obvious. First, the Court notes that it places

8    primary reliance on <u>Cruz</u> as setting out the clearly-established law that Leenstra violated.

9    Second, the Court finds that <u>Hayes</u> and <u>George</u> both confirmed that an officer cannot use deadly

10   force against a non-threatening individual and the facts of both cases are sufficiently analogous

11   to the situation Leenstra faced to put him on notice that he could not use deadly force. In <u>Hayes</u>,

12   the officers shot the plaintiff inside of a home while he was holding a knife downward but not

13   evading arrest. 736 F.3d at 1233-34. And in, <u>George</u> the officers used deadly force to shoot a

14   non-threatening individual who was armed with a pistol facing downward. 736 F.3d at 832-33.

15   Both of these cases clearly established that in far more threatening situations (where the plaintiff

16   possessed a weapon), it was unconstitutional to use deadly force against a non-threatening

17   individual such as Sarrett. These cases help support the Court's finding that Leenstra is not

18   entitled to qualified immunity. And while the cases applied the "obviousness principle," the

19   Court does not rely on that principle here. Instead, it finds both <u>Hayes</u> and <u>George</u> confirm

20   Leenstra violated clearly established based on the facts presented in the Complaint.

21          The Court DENIES the Motion seeking qualified immunity as to this claim.

22

23

24

### 3.  No Qualified Immunity on Fourteenth Amendment Claim

Leenstra fails to convince the Court that he is entitled to qualified immunity on Stenson's Fourteenth Amendment claim. Leenstra does not articulate precisely why he is entitled to qualified immunity. He seems to suggest that although the law is clear, the facts here do not show a "purpose to harm."  But as the Court has explained above, it does not believe that the "purpose to harm" necessarily applies, given the allegations in the Complaint. And because Leenstra has not explained why he is entitled to qualified immunity on the lower, deliberate indifference standard, the Court finds this oversight fatal to the request. Leenstra's failure to brief the applicable standard subjects the Motion to dismissal. The Court DENIES the Motion and does not find Leenstra entitled to qualified immunity on this claim.

### 4.  No Qualified Immunity for Unreasonable Seizure

Because Leenstra has not argued he is entitled to qualified immunity on the unreasonable search and seizure claim, the Court declines to dismiss the claim on qualified immunity grounds.

### E.  Stenson's State Law Claims Survive

Defendants argue that they are entitled to common law qualified immunity for the state law claims for the same reasons as he is entitled to immunity from the federal claims. (See MTD at 9 (citing Dang v. Ehredt, 95 Wn. App. 760. 680 (1999) (noting that courts apply the same federal qualified immunity analysis for claims of common law qualified immunity)).) Given the Court's rejection of Leenstra's qualified immunity claim under federal law, it finds that Defendants are similarly unentitled to qualified immunity for the state law claims. And as explained below, the Court also rejects the other reasons Defendants identify to dismiss the negligence, false arrest/false imprisonment, and negligent infliction of emotional distress claims.

### 1.      Negligence

Defendants argue that the totality of the circumstances here justified the use of force to "subdue" Sarrett and that his decision was objectively reasonable. (See Reply at 10.) This argument improperly construes the facts in the complaint in Leenstra's favor and ignores the facts which show Leenstra acted unreasonably, failed to de-escalate, or even find out if Sarrett was armed before shooting without warning. A jury should determine whether Leenstra acted reasonably or not. The Court DENIES the Motion as to this claim.

### 2.      False Arrest/False Imprisonment

Leenstra argues that he had probable cause to arrest Sarrett because he was obstructing the officer by not removing his hands from his pockets when ordered. But such a conclusion would require evidence that Sarrett "willfully hinder[ed], delay[ed], or obstruct[ed]" Leenstra. RCW 9A.76.020(1). Here, the Capps Complaint alleges that Sarrett was actually "attempting to remove the items from his pockets to show he was unarmed." (Capps Compl. ¶ 4.7.) Based on these allegations, the Court cannot conclude that Sarrett was willfully hindering, delaying, or obstructing Leenstra. This prevents dismissal and the Court DENIES the Motion as to this claim.

### 3.      Negligence Infliction of Emotional Distress

"The tort of negligent infliction of emotional distress is a limited, judicially created cause of action that allows a family member a recovery for "foreseeable" intangible injuries caused by viewing a physically injured loved one shortly after a traumatic accident." Colbert v. Moomba Sports, Inc., 163 Wn.2d 43, 49 (2008). Stenson argues that Sarrett's estate is entitled to recover for the emotional damage Sarrett experienced after being shot and before dying. This tracks the legal standard. Nevertheless Defendants argue that Sarrett can only recover if he pleads "objective symptomatology" to recovery and that he fails to do so. Defendants' argument

1   appears misplaced. Objective symptomatology is only required for bystanders who are at the

2   scene of an accident, not the person actually injured and none of the authority Leenstra identifies

3   supports extending this ruling to the injured party. See Colbert, 163 Wn.2d at 50; Hegel v.

4   McMahon, 136 Wn.2d 122, 125-26, 132 (1998); Repin v. State, 198 Wn. App. 243, 260 (2017).

5   This is fatal to Defendants' argument and they identify no reason why the claim should be

6   dismissed. The Court DENIES the Motion as to this claim.

7           **4.      Battery and Wrongful Death Claims**

8           The Court notes that Defendants have not moved to dismiss the battery or wrongful death

9   claims. As such, the Court passes no judgment on the adequacy of the allegations as to these

10  claims.

11                              **CONCLUSION**

12          King County has successfully demonstrated that it cannot be vicariously liable for

13  Stenson's federal claims alleged against it. The Court therefore GRANTS the Motion and

14  DISMISSES these claims against King County. But Defendants otherwise fail to demonstrate

15  any basis to dismiss the federal claims against Leenstra or any of the state law claims alleged

16  against Defendants. The Court DENIES the Motion as to those claims.

17          The clerk is ordered to provide copies of this order to all counsel.

18          Dated April 22, 2024.

19

20                                      Marsha J. Pechman
                                        United States Senior District Judge

21

22

23

24