1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

DEREK STENSON,

CASE NO. C23-1316 MJP

11

            Plaintiff,

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND MOTION TO
EXCLUDE

12

    v.

13

KING COUNTY, et al.,

14

            Defendants.

15

16    This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt.

17    No. 36) and Motion to Exclude (Dkt. No. 39). Having reviewed the Motions, the Responses

18    (Dkt. Nos. 44, 45), the Replies (Dkt. Nos. 47, 49), and all supporting materials, the Court

19    DENIES in part and GRANTS in part the Motion for Summary Judgment and DENIES the

20    Motion to Exclude.

21                                **BACKGROUND**

22    As personal representative to the estate of Joshua Sarrett, Plaintiff Derek Stenson brings

23    federal and state law claims against King County and Jacob Leenstra, a Sheriff's Deputy, who

24

shot and killed Sarrett on September 19, 2020, while responding to a request for help at Sarrett's residence. The Court reviews the relevant facts before examining the claims asserted and the two experts whose opinions Defendants seek to exclude.

**A.    Factual Background**

On September 19, 2020, Sarrett's sisters, Chantal Capps and Amanda Haynes, went to Sarrett's home in Auburn to check on his welfare after hearing reports that he had been depressed, drinking excessively, and physically abusing his girlfriend, Taylor Nystrom. (Deposition of Chantal Capps at 87, 91 (Dkt. No. 45-4).) When they arrived, the sisters found Sarrett so drunk he had difficulty standing up. (Capps Dep. at 91-93; Deposition of Amanda Haynes at 71 (Dkt. No. 45-7).) Sarrett was both irrational and emotional with substantial mood swings. (Id.) Capps testified that this was the drunkest she'd ever seen Sarrett, and was worried Sarrett might kill himself. (Capps. Dep. at 91-92, 97.) Capps took Sarrett to a nearby convenience store to buy cigarettes so that Haynes could speak alone with Nystrom. (Capps Dep. at 94; Haynes Dep. at 71-75.) Haynes spoke with Nystrom, but did not learn much before Sarrett and Capps returned. (Id.)

After returning from the store, Sarrett showed his sisters a gun which he removed from his shorts pocket. (Haynes Dep. at 76; Capps. Dep. at 100-01.) Haynes was fearful that "[she] was going to be get shot" by Sarrett "on accident . . . [because] he wasn't walking straight, and he was like 'look at my gun,' waiving it around . . . and he was messing with it and he pointed it at his stomach at one point." (Haynes Dep. at 76-77.) At this point, Haynes "wanted an intervention" because Sarrett was "not in a sane enough place to have a gun." (Id.) Capps and Haynes both knew that Sarrett was barred from possessing a weapon due to a domestic violence court order—"[l]egally, he shouldn't have a gun, so that's bullshit[.]" (Id.; see also Domestic

Violence Court Order (Ex. D to the Declaration of Amy Montgomery (Dkt. No. 37-1 at 66-67)).)
While Capps spoke alone with Sarrett in the house, Sarrett pointed his gun at Capps' head.
(Capps. Dep. at 103-04; Haynes Dep. at 78.) After saying there were no bullets in the gun,
Sarrett uncocked the gun and discovered a bullet in it. (Id.) Capps took the bullet and exited the
house. (Capps. Dep. at 104.) She handed it to Haynes and told her that Sarrett had put the gun to
her face and pulled the trigger to prove that it wasn't loaded, only to find one bullet left inside of
it. (Haynes Dep. at 77-78.) At that point Haynes concluded: "'Let's just fucking call the cops.
Let's get it over with.' Like what more do we need to see at this point." (Haynes Dep. at 78.)
Although Capps was not afraid for her own safety, she did not feel safe with the situation.
(Capps Dep. at 106.)

Capps and Haynes then left the home and got into their car to discuss what to do next.
They happened to see King County Sherriff's Deputy Jacob Leenstra driving down the street in
his Sherriff's truck. (Haynes Dep. at 81; Capps Dep. at 107.) Capps agreed with Haynes' idea to
flag down Leenstra for help. (Capps. Dep. at 107-8.) Haynes just wanted Sarrett to be arrested to
sober up. (Haynes Dep. at 81.) Leenstra pulled over at the sister's request, and spoke to them on
the street outside of Sarrett's home. Haynes told Leenstra that she and her sister "were there
investigating a domestic violence charge, that [Sarrett] was really drunk, and that he just had a
gun just loosely in his pocket"—meaning that it was unholstered. (Haynes Dep. at 81-82.)
Haynes told Leenstra that Sarrett had pointed a gun at Capps. (Haynes Dep. at 84; Capps Dep. at
108-09.) And either Capps or Haynes told Leenstra that Sarrett had been shooting the gun in his
yard at some point. (Deposition of Jacob Leenstra at 52 (Dkt. No. 45-2).) Haynes also explained
that there was a court order prohibiting Sarrett from possessing a gun. (Leenstra Dep. at 50, 55.)

1  Leenstra gathered from Haynes that Nystrom was the potential victim of domestic violence.

2  (Leenstra Dep. at 57.)

3      After speaking with the sisters, Leenstra attempted to speak to Nystrom to investigate the

4  abuse allegations. (Capps Dep. at 109; Leenstra Dep. 45-47.) But it was difficult to speak to

5  Nystrom, as she would obey Sarrett's command not to speak to Leenstra and retreat into the

6  house with Sarrett. (Capps Dep. at 109; Haynes Dep. at 85-86; Leenstra Dep. at 47-48.) Sarrett

7  told Nystrom not to speak to Leenstra—yelling something along the lines of "shut the fuck up."

8  (Capps Dep. at 109.) Leenstra also tried to speak with Sarrett, but without much success as he

9  refused to sit down as Leenstra asked. (See Haynes Dep. at 85-86.) Sarrett was not cooperative

10  with Leenstra's request to speak with him, and was instead focused on trying to get his dog back

11  into the house. (Leenstra Dep. at 49.) Sarrett ultimately told Leenstra he would need a warrant to

12  enter his house. (Haynes Dep. at 85-86.) Leenstra noted that Sarrett was intoxicated and he

13  observed Sarrett remove a gun magazine from his pocket. (Leenstra Dep. at 51.)

14      Leenstra decided that based on what he had been told and observed, he did not want to

15  leave until he investigated the domestic violence allegations. (Leenstra Dep. at 50.) He called for

16  backup early on in the interaction and told the dispatcher to "hold the air," meaning that it was a

17  high stress interaction. (Leenstra Dep. at 61-62.) Leenstra believed that he was investigating

18  possible domestic violence and the illegal possession of a firearm that had also potentially been

19  discharged and pointed at Capps. (Leenstra Dep. at 40, 55-56.) Through the encounter, Leenstra

20  was concerned that the Sarrett's "very heavy right pocket" of his shorts contained the gun that

21  Haynes had described. (Leenstra Dep. at 59,  64.) It was the same pocket from which Leenstra

22  had seen Sarrett display a pistol magazine. (Leenstra Dep. at 64.) Indeed, Haynes believed that

23  Sarrett still had the gun in his pocket during these interactions. (Haynes Dep. at 86.) At the same

24

1    time, Leenstra was aware that Sarrett appeared intoxicated and had been told he was intoxicated.

2    (Leenstra Dep. at 59.) But Sarrett had told Leenstra that he did not have a gun and Leenstra never

3    asked Sarrett if he had a gun. (Leenstra Dep. at 57, 74.)

4          Within five minutes of his arrival, Leenstra shot and struck Sarrett four times from

5    roughly fifty feet away while Sarrett stood outside his home and Leenstra was positioned by his

6    truck. (Capps Dep. at 81-82; Leenstra Dep. at 62-65; Haynes Dep. at 85-86.) At the time of the

7    shooting, Capps and Haynes were with Leenstra, while Nystrom was somewhere outside the

8    house. (See Leenstra Dep. at 58.) Leenstra was instructing Nystrom to come towards him to talk,

9    while Sarrett was telling Nystrom to go back into the house. (Leenstra Dep. at 58.) The Parties

10   agree that Leenstra provided no warning that he would shoot. (Capps Dep. at 122.) But there is

11   some dispute as to what Leenstra demanded Sarrett do with his hands before he fired. Leenstra

12   testified that shortly before he opened fire, he ordered Sarrett three times to keep his hands out of

13   his pockets and put his hands in the air and that Sarrett failed to do so. (Leenstra Dep. at 58, 62.)

14   He feared that Sarrett had a weapon in his pocket and would use it. (Leenstra Dep. at 59, 64.) In

15   her deposition, Capps testified that Sarrett had taken "everything out of his pockets" in front of

16   Leenstra and that "the officer had not told him to not put his hands in his pockets until the second

17   time that he did it." (Capps Dep. at 81, 101, 111, 113.) Capps testified that the second time

18   Sarrett put his hands in his pockets, he "was struggling to get the clip out" to show Leenstra.

19   (Capps Dep. at 111, 113.) In full, Capps only recalled Leenstra giving one warning. (Capps Dep.

20   at 110-13.) According to Haynes, Sarrett "had his hands going towards his pockets" when

21   Leenstra shot him. (Haynes Dep. at 85-86.) During an interview given shortly after the shooting,

22   Capps reported that Sarrett reached into his pockets and pulled "stuff out" and then Leenstra

23   ordered him to remove his hands from his pockets. (Capps  Dep. at 81-82.) Capps also said that

24

1    Sarrett then reached into his pocket again and was "struggling to get the clip out," but he had

2    "pulled his hand out" and had his "hands up in the air with his stuff" when Leenstra shot. (Capps

3    Statement (Dkt. No. 37-1 at 279-80.)

4        After Leenstra shot Sarrett, he cuffed him and began to provide medical care until

5    Auburn Police arrived. (Leenstra Involuntary Garrity Statement at 5 (Dkt. No. 45-3).) Sarrett

6    died shortly after Leenstra shot him. No gun was found on his body—the gun was instead later

7    found in the house. (Declaration of Amy Montgomery Exs. P & U at 6.) According to Leenstra,

8    he did not have an option to use less lethal force because he was out of range of either a taser or

9    pepper spray. (Leenstra Dep. 28-29, 38-39.)

10   **B.    Claims**

11       Plaintiff pursues three 42 U.S.C. § 1983 claims: (1) unreasonable search and seizure in

12   violation of the Fourth Amendment; (2) excessive use of force in violation of the Fourth

13   Amendment; and (3) denial of substantive due process under the Fourteenth Amendment.

14   Plaintiff also pursues five state law claims: (1) false imprisonment/false arrest; (2) battery; (3)

15   negligence; (4) wrongful death; and (5) negligent infliction of emotional distress. The Court

16   previously dismissed Plaintiff's federal claims against Defendant King County, though it remains

17   named as a defendant to the state-law claims. (Order on MTD (Dkt. No. 25).)

18   **C.    Experts**

19       Defendants move to exclude two of Plaintiff's experts: Russ Hicks and Roger Clark. The

20   Court briefly reviews these two experts' general opinions.

21       Hicks, who has substantial experience in law enforcement and officer training in

22   Washington, opines as to whether Leenstra's actions complied with "policy, police standards,

23   and . . . basic police academy training [Leenstra] received at the [Washington State Criminal

24

1    Justice Training Center] regarding criminal laws, reasonable suspicion, probable cause, use of

2    force, patrol tactics, and de-escalation in the confrontation and the use of deadly force[.]" (Hicks

3    Report at 29-41 (Ex. B to the Declaration of Amy Montgomery (Dkt. No. 40-1)).) Hicks believes

4    that Leenstra's actions did not comply with policy, standards, or the training he received. (See

5    id.)

6        Clark has extensive law enforcement experience and provides his opinion on whether

7    Leenstra's use of deadly force was reasonable and consistent with police training and a

8    "reasonable professional standard of care" for police officers. (Clark Report at 2 (Montgomery

9    Decl. Ex. C (Dkt. No. 40-1)).) Unlike Hicks, Clark has not been an officer in Washington State.

10                                      **ANALYSIS**

11   **A.    Summary Judgment Standard**

12       Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

13   file, and any affidavits show that there is no genuine issue as to any material fact and that the

14   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

15   an issue of fact exists, the Court must view all evidence in the light most favorable to the

16   nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty

17   Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is

18   sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The

19   moving party bears the initial burden of showing that there is no evidence which supports an

20   element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

21   Once the movant has met this burden, the nonmoving party then must show that there is a

22   genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

23

24

1  existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

2  matter of law." Celotex, 477 U.S. at 323-24.

3  **A.    Excessive Force Claim**

4  Defendants move for summary judgment on Plaintiff's Fourth Amendment excessive

5  force claim on the theory that Leenstra's decision to use deadly force was objectively reasonable.

6  On the record presented, the Court finds that Defendants are not entitled to summary judgment.

7  **1.    Legal Standard**

8  The Fourth Amendment guarantees citizens the right "to be secure in their persons . . .

9  against unreasonable . . . seizures" of the person. U.S. Const. amend. IV. "Determining whether

10  the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a

11  careful balancing of the nature and quality of the intrusion on the individual's Fourth

12  Amendment interests against the countervailing governmental interests at stake." Graham v.

13  Connor, 490 U.S. 386, 396 (1989) (citation and quotation omitted).

14  The touchstone in evaluating an officer's use of force is objective reasonableness. See

15  Graham, 490 U.S. at 397 (citing Scott v. United States, 436 U.S. 128, 137–39 (1978)). "The

16  'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

17  officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396 (citing Terry v.

18  Ohio, 392 U.S. 1, 20–22 (1968)). But the test itself is "not capable of precise definition or

19  mechanical application" and instead "requires careful attention to the facts and circumstances of

20  each particular case." Id. (citation and quotation omitted). The reasonableness standard "nearly

21  always requires a jury to sift through disputed factual contentions," so summary judgment in an

22  excessive-force case "should be granted sparingly." Torres v. City of Madera, 648 F.3d 1119,

23  1125 (9th Cir. 2011) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)).

24

The reasonableness of the officer's conduct is assessed by balancing the "nature and quality of the intrusion" on the plaintiff's Fourth Amendment rights against the government's countervailing interest in the force used. Graham, 490 U.S. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). "Standing in the shoes of the 'reasonable officer,' we then ask whether the severity of force applied was balanced by the need for such force considering the totality of the circumstances, including (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Torres, 648 F.3d at 1124.

"The 'most important' Graham factor . . . [is] the level of threat [the plaintiff] posed immediately before his death." Est. of Aguirre v. Cnty. of Riverside, 29 F.4th 624, 628 (9th Cir.), cert. denied sub nom. Cnty. of Riverside, California v. Est. of Clemente Najera-Aguirre, 143 S. Ct. 426 (2022) (quoting Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)). In making this evaluation, we must also recognize that "[d]eadly force is the most severe intrusion on Fourth Amendment interests because an individual has a 'fundamental interest in his own life' and because, once deceased, an individual can no longer stand trial to have his 'guilt and punishment' determined." Aguirre, 29 F.4th at 628 (quoting Garner, 471 U.S. at 9). "Before using deadly force, law enforcement must, 'where feasible,' issue a warning." Id. (quoting Garner, 471 U.S. at 11–12). We also "recognize that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' and that these judgments are sometimes informed by errors in perception of the actual surrounding facts." Torres, 648 F.3d at 1124 (quoting Graham, 490 U.S. at 397). When there is error in perception in judgment, we

1    judge its reasonableness by "ask[ing] whether a reasonable officer would have or should have

2    accurately perceived that fact." Id.

3        Below, the Court reviews the three Graham factors and Leenstra's failure to issue a

4    warning before shooting.

5        **2.    Severity of Crime**

6        The Court's review of the record shows no dispute of fact that the crimes Leenstra was

7    investigating were serious, potential felonies.

8        It is undisputed that Leenstra learned from Haynes that Sarrett had pointed a gun at

9    Capps and that both sister "were there investigating a domestic violence charge[.]" (Haynes Dep.

10   at 81-82, 84; Capps Dep. at 108-09.) Leenstra also learned that Sarrett had been shooting a gun

11   in his backyard at some point, and that a court order prohibited Sarrett from possessing a gun.

12   (Leenstra Dep. at 50, 55, 57.) Based on this evidence, Leenstra could reasonably have believed

13   he was investigating the felonies of illegal possession of a firearm, assault with a firearm, and

14   potential domestic violence. These are serious offenses, and they tend to support the use of force.

15   See Miller v. Clark Cnty., 340 F.3d 959, 964 (9th Cir. 2003) ("The government has an

16   undeniable legitimate interest in apprehending criminal suspects, and that interest is even

17   stronger when the criminal is . . . suspected of a felony, which is by definition a crime deemed

18   serious by the state." (citation omitted)).

19       Plaintiff argues that because Leenstra did not personally observe Sarrett commit a crime

20   leading up the shooting, there was no serious crime to have been investigated. Plaintiff identifies

21   no case law to support the assertion. Rather, it is enough for the officer to have received credible

22   information from a witness or victim to permit the officer to investigate an alleged crime.

23   "Probable cause exists when police have knowledge at the moment of arrest of facts and

24

1    circumstances based on reasonably trustworthy information that would warrant a belief by a

2    reasonably prudent person that the person arrested has committed a criminal offense." Franklin

3    v. Fox, 312 F.3d 423, 438 (9th Cir. 2002). Here, Leenstra had sufficient, credible information

4    from both Haynes and Capps to investigate and have a reasonable suspicion Sarrett had engaged

5    in felony conduct.

6          **3.**      **Immediacy of the Threat to Officer or Others**

7         The most important Graham factor is the "'the level of immediate threat [Sarrett] posed

8    to the officer or others.'" Aguirre, 29 F.4th at 628 (quoting Graham, 490 U.S. at 396).

9         The Court finds a dispute of material fact as to the immediacy of the threat Sarrett posed

10   to Leenstra and the bystanders. As Plaintiff argues, Leenstra did not observe Sarrett physically

11   threaten anyone, point a weapon at anyone, or even possess a weapon. Indeed, Sarrett told

12   Leenstra he did not have a gun. At most, Leenstra observed Sarrett possess a gun magazine, yell

13   at Nystrom, and fail to comply with Leenstra's commands to sit down. And while Leenstra

14   understood that Sarrett had pointed the gun at Capps and shot his weapon in the front yard

15   earlier, he did not observe any such behavior at the time he was interacting with Sarrett. Indeed,

16   Leenstra did not observe Sarrett point a weapon at him or making any threatening gestures.

17   Sarrett had a "heavy pocket," but that alone, construed in Plaintiff's favor, does not show an

18   immediate threat. Additionally, Sarrett's position relative to the others at the scene call into

19   question the immediacy of the threat. When Leenstra opened fire, Haynes and Capps were with

20   him taking cover at his truck, while Sarrett was 50 feet away. Although Nystrom's position is not

21   entirely clear, a jury could conclude that she was not at risk of being shot even if one assumes

22   Sarrett was armed. Construing the facts in the light most favorable to Plaintiff, a jury could

23

24

1    conclude that Sarrett did not pose an immediate threat and that Leenstra could have simply

2    waited for the dispatched backup to arrive.

3         The Court also notes a dispute of fact exists as to the immediacy of the threat to those

4    present at the scene. When Leenstra opened fire, he was positioned next to his truck with Capps

5    and Haynes. Sarrett was 50 feet away and Nystrom's position was unclear.

6         Leenstra fails to show uncontroverted evidence that he encountered an immediate threat.

7    Leenstra believed that Sarrett had a gun in his pocket and was refusing to remove his hands from

8    his pocket. A jury may well believe that Leenstra's observations and conclusions were

9    reasonable and that Sarrett's posed an immediate threat. But at this juncture and applying the

10   summary judgment standard, the Court cannot accept Leenstra's disputed version of the facts and

11   construe them in his favor. A jury must resolve this issue of fact.

12        **4.    Escape or Resisting Arrest**

13        The Court further notes that there is little evidence that Sarrett was actively resisting

14   arrest or attempting to flee. At most, Sarrett was uncooperative in speaking to Leenstra and

15   verbally abusive to Nystrom and Leenstra. Construing the facts in the light most favorable to

16   Plaintiff, the Court finds that Sarrett was neither attempting to flee nor resisting arrest. And

17   Leenstra never told Sarrett that he was under arrest or suspected of committed any crimes.

18        **5.    Failure to Warn**

19        Plaintiff also faults Leenstra for failing to warn Sarrett that he would use force before he

20   shot. While not a core Graham factor, the Court finds this factual issue relevant to the overall

21   analysis of the use of the reasonableness of the use of force. It also finds that this tends to favor

22   Plaintiff's opposition to summary judgment.

23                                    *    *    *

24

1    Based on its analysis of the Graham factors, the Court finds that material issues of fact

2    preclude summary judgment in Leenstra's favor on this claim. A jury must sort through the

3    material facts, particularly the immediacy of the threat, and render its decision at trial. The Court

4    therefore DENIES the Motion for Summary Judgment as to the Fourth Amendment claim given

5    the factual disputes as to whether the use of force was reasonable. The Court also notes that

6    Defendants have not moved for summary judgment as to Plaintiff's unreasonable search and

7    seizure claim, and that it may therefore also proceed to trial.

8    **B.    Federal Qualified Immunity**

9    Leenstra again asks for qualified immunity on Plaintiff's excessive force claim. The

10   Court again finds that Leenstra is not entitled to qualified immunity.

11   **1.    Legal Standard**

12   Qualified immunity protects government officials "from liability for civil damages

13   insofar as their conduct does not violate clearly established statutory or constitutional rights of

14   which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

15   It protects government officials "unless (1) they violated a federal statutory or constitutional

16   right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of

17   Columbia v. Wesby, 583 U.S. 48, 62–63 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664

18   (2012)). The Court may address either prong first, see Pearson v. Callahan, 555 U.S. 223, 236–

19   42 (2009), and "may exercise [its] discretion to resolve a case only on the second ground when

20   no clearly established law shows that the officers' conduct was unconstitutional," O'Doan v.

21   Sanford, 991 F.3d 1027, 1036 (9th Cir. 2021).

22   A right is clearly established when it is "sufficiently clear that every reasonable official

23   would have understood that what he is doing violates that right." Reichle, 566 U.S. at 664

24

1    (internal quotation marks and alterations omitted). There need not be "a case directly on point, so

2    long as the "existing precedent" "place[d] the statutory or constitutional question beyond

3    debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). "Such specificity is especially important

4    in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult

5    for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the

6    factual situation the officer confronts.'" Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam)

7    (alteration omitted) (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)).

8         "Cases 'cast at a high level of generality' are unlikely to establish rights with the requisite

9    specificity." Waid v. Cnty. of Lyon, 87 F.4th 383, 388 (9th Cir. 2023) (quoting Brosseau v.

10   Haugen, 543 U.S. 194, 199 (2004) (per curiam)). "While a case addressing general principles

11   may clearly establish a right in an obvious case, such obvious cases are rare." Id. (citation and

12   quotation omitted). "Instead, a clearly established right usually requires "controlling authority or

13   a robust consensus of cases of persuasive authority." Id. (quoting Wesby, 583 U.S. at 63). In

14   such cases, the plaintiff "must either explain why their case is obvious under existing general

15   principles or, more commonly, show specific cases that control or reflect a consensus of non-

16   binding authorities in similar situations." Id.

17        **2.    No Qualified Immunity for Excessive Force Claim**

18        The Parties dispute whether the law is clearly established that Leenstra acted in violation

19   of the Fourth Amendment by shooting Sarrett without warning shortly after demanding him to

20   remove his hands from his pockets. Construing the facts in Sarrett's favor, the Court finds that

21   Leenstra's use of deadly force violated clearly established law.

22        At the time of the incident, the law was sufficiently clear that that an officer may not

23   shoot a suspect who is not actively reaching for a weapon. See Cruz v. City of Anaheim, 765

24

F.3d 1076, 1077–79 (9th Cir. 2014). "Cruz establishe[d] that officers may not fire at a suspect—even an armed suspect—absent some reason to believe that the suspect will soon access or use the weapon." Peck v. Montoya, 51 F.4th 877, 888 (9th Cir. 2022). Well before the shooting here, the Ninth Circuit also made clear that an officer "may not kill suspects simply because they are behaving erratically, nor may they 'kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." Id. at 887–88 (quoting Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997)).

The Ninth Circuit has also recognized more generally that "[d]eadly force is not justified '[w]here the suspect poses no immediate threat to the officer and no threat to others.'" Aguirre, 29 F.4th at 629 (quoting Garner, 471 U.S. at 11). In Aguirre, decided after the facts at issue in this case, the Ninth Circuit found this "general constitutional principle" applied "with obvious clarity" to the facts presented, even without a more specific, analogous case. Id. In Aguirre, the Ninth Circuit explained that this obviousness principle applied to the case before it because the plaintiff "posed no immediate threat to [the officers] or others at the time of his death." Id. In reaching this conclusion, the Court pointed out that two prior decisions that supported its rationale. First, in Hayes v. Cnty. of San Diego, the Court found that an officer's use of deadly force was unreasonable when they fatally shot Hayes after encountering him inside his girlfriend's home holding a large knife pointed tip-down and standing six to eight feet away. 736 F.3d 1223, 1227–28 (9th Cir. 2013). The Court noted that Hayes was not threatening the officers and was not evading arrest, and the officer provided no advance warning. Id. at 1233-34. Second, the Aguirre Court cited George v. Morris, where the Ninth Circuit found it was unreasonable for officers responding to a domestic disturbance call to fatally shoot a suspect who emerged from his home onto his porch with his pistol pointed down. 736 F.3d 829, 832-33, 839 (9th Cir. 2013).

1    Construing the disputed facts here in Plaintiff's favor, Leenstra violated clearly

2    established law by shooting Sarrett repeatedly without warning after Sarrett told Leenstra he was

3    unarmed and where Sarrett was not actively reaching for a weapon or threatening Leenstra.

4    While Leenstra believed that Sarrett might have been armed, he only saw Sarrett in possession of

5    a gun magazine in his shorts. Sarrett also told him he did not have a gun, and he made no threat

6    to use a gun or to harm anyone present. And Leenstra failed to ask Sarrett whether he had a

7    weapon on him or warn him that he might shoot. According to Capps, Sarrett was trying to show

8    Leenstra he had no weapon in his pockets, and he had his hands in the air when Leenstra shot.

9    Construing the facts in the light most favorable to Sarrett, Leenstra violated clearly established

10   law by using deadly force without warning against a person who posed no immediate threat and

11   who was not reaching for a weapon. See Cruz, 765 F.3d at 1077–79. Leenstra is not entitled to

12   qualified immunity and the Court DENIES the Motion on this issue.

13   **C.    Fourteenth Amendment Claim Abandoned**

14   Leenstra has moved for summary judgment on Plaintiff's Fourteenth Amendment claim,

15   and Plaintiff has not opposed the Motion as to this claim. Given Plaintiff's lack of opposition, the

16   Court GRANTS summary judgment in Leenstra's favor on this claim.

17   **D.    State Law Claims**

18   Invoking Washington's felony-bar affirmative defense, Defendants argue that Plaintiff

19   cannot pursue any state law claims because Sarrett's illegal possession of a firearm is a felony

20   that proximately caused his death. The Court finds merit in this argument and GRANTS

21   summary judgment in Defendants' favor on this defense, which bars all state law claims.

22   "In an action arising out of law enforcement activities resulting in personal injury or

23   death, it is a complete defense to the action that the finder of fact has determined beyond a

24

1   reasonable doubt that the person injured or killed was engaged in the commission of a felony at

2   the time of the occurrence causing the injury or death, the commission of which was a proximate

3   cause of the injury or death." RCW 4.24.420(2). "Washington's felony bar statute, RCW

4   4.24.420, creates a complete defense to any action for damages for personal injury or wrongful

5   death if the person injured or killed was engaged in the commission of a felony at the time of the

6   injury or death and the felony was a proximate cause of the injury or death." Davis v. King

7   Cnty., 16 Wn. App. 2d 64, 66 (2021). "On its face, the statute applies even if the defendant was

8   negligent or unreasonable." Id.

9       Here, it is undisputed that Sarrett possessed a weapon illegally and that Leenstra had

10  probable cause to believe that Sarrett illegally possessed a gun. Leenstra was reliably told by

11  Haynes and Capps that Sarrett not only had a gun, but that he was not permitted to have a gun

12  due to a court order. Leenstra also observed the gun magazine in Sarrett's shorts and the gun

13  itself was ultimately found in the home after Sarrett died. Given these facts, a finder of fact could

14  find beyond a reasonable doubt that Sarrett illegally possessed a firearm. And Plaintiff does not

15  specifically argue that there were any doubts that Sarrett's possessed a firearm or that his

16  possession was a felony.

17      The Court also finds no dispute of fact that Sarrett's illegal possession of a firearm was a

18  proximate cause of his death. It is undisputed that Leenstra believed that Sarrett was armed with

19  an illegal gun, and that he used deadly force because he feared Sarrett would fire the weapon at

20  him or a bystander. The illegal possession of the firearm was a but-for cause in Leenstra's

21  decision to use deadly force. And even though Leenstra was mistaken about Sarrett's possession

22  of the gun on his person, Leenstra had reasonable grounds to know that Sarrett possessed a gun

23  illegally. The causal chain remains unbroken even though Leenstra was mistaken that Sarrett had

24

1   the weapon on him at the time of the shooting, because Leenstra acted on his belief that Sarrett

2   had the weapon. The illegally-possessed gun therefore serves as a proximate cause in the death.

3        Based on these undisputed facts, the Court GRANTS summary judgment in Defendants'

4   favor on this affirmative defense, which bars the state law claims. While Defendants moved for

5   summary judgment on the merits of Plaintiff's state law claims, the Courts finds no grounds to

6   analyze these unopposed arguments, as doing so is not necessary.

7   **E.**      **Motion to Exclude**

8        Defendants ask to exclude both Hicks' and Clark's reports and opinions in their entirety.

9   (Mot. to Exclude at 6, 8.) The Court finds no merit in this request.

10       Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill,

11  experience, training, or education may testify in the form of an opinion or otherwise if": (1) the

12  technical or specialized knowledge will help the trier of fact understand the evidence; (2) the

13  expert testimony is "based on sufficient facts or data"; (3) "the testimony is the product of

14  reliable principles and methods"; and (4) "the expert has reliably applied the principles and

15  methods to the facts of the case." Fed. R. Evid. 702. To assess an expert's reliability, "the trial

16  judge must determine whether the testimony has 'a reliable basis in the knowledge and

17  experience of [the relevant] discipline.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149

18  (1999) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993)). "Rule 702

19  contemplates a broad conception of expert qualifications." Hangarter v. Provident Life & Acc.

20  Ins. Co., 373 F.3d 998, 1015 (9th Cir. 2004) (quotation and citation omitted). "[F]ar from

21  requiring trial judges to mechanically apply the Daubert factors—or something like them—to

22  both scientific and non-scientific testimony, Kumho Tire heavily emphasizes that judges are

23

24

1    entitled to broad discretion when discharging their gatekeeping function." <u>United States v.</u>

2    <u>Hankey</u>, 203 F.3d 1160, 1168 (9th Cir. 2000).

3          The Court here finds that both Hicks and Clark may present their opinions to the jury.

4    **1.    Hicks**

5          The Court reviews and rejects all four basis on which Defendants seek to exclude Hicks'

6    opinions.

7          First, Defendants argue that Hicks' opinions should be excluded because he omitted data

8    provided by Leenstra about Sarrett's behavior. Defendants argue that Hicks did "not attempt to

9    opine whether an officer could reasonably mistake a gun magazine in a pocket for a gun." (Mot.

10   at 3.) But this criticism does not identify a critical flaw in Hicks' methodology or any basis to

11   conclude that his opinion is based on insufficient data. At most, it identifies an issue that may be

12   relevant to the fact-finder's determination, but not one that is required to make the expert's

13   opinion admissible or reliable.

14         Second, Defendants argue that Hicks' opinion is unreliable because he did not base his

15   opinion on statements made a month after the shooting. (Mot. at 3-4.) But Hicks' decision as to

16   what evidence he found more persuasive does not mean his opinion is subject to exclusion. At

17   trial, Defendants will be free to attack his decision to put greater weight on certain evidence and

18   discount other evidence. But that is not a basis for exclusion.

19         Third, Defendants argue that Hicks' opinion was excluded in another case. But this

20   argument fails to identify any reason why Hicks' opinions in <u>this</u> case should be excluded. The

21   Court rejects this incomplete argument.

22         Lastly, Defendants point out that Hicks may have overlooked certain evidence. But the

23   fact that he may have based his conclusion on an incomplete record is not grounds for the

24

1    exclusion of his report. At trial, Defendants can point out the gaps in Hicks' opinion to the finder

2    of fact, who will be well-positioned to weigh the value of Hicks' testimony and opinions. Any

3    omissions will go to the persuasiveness of his opinions.

4    **2.    Clark**

5    The Court reviews and rejects all four of Defendants' attacks to Clark's opinions.

6    First, Defendants argue that Clark lacks sufficient "experience on modern police

7    standards" to provide his opinion on the standard of care for use of force. (Mot. at 6.) Defendants

8    point out that Clark has never been a police officer in Washington and he fails to cite

9    Washington law in rendering his opinion. It is true that Clark has not been a police officer in

10    Washington and that he was last an officer in 1993. But he has extensive law enforcement

11    experience identified in his report that supports his views on the standards of police use of force.

12    This is relevant to Plaintiff's federal claims, which do not require any particular expertise in

13    Washington State. The Court finds that Clark has sufficient relevant expertise that supports his

14    opinions under Rule 702.

15    Second, Defendants argue that Clark fails to identify the <u>Graham</u> factors in his analysis

16    and that he invokes the wrong standard. The Court finds no merit in this criticism. Clark opinions

17    generally on the use of force and whether it was objectively reasonable, given his experience and

18    training. While his report could be clearer about the legal framework, that alone does not merit

19    exclusion of his opinion. The jury will be well positioned to analyze Clark's opinions and place

20    them within the legal framework as the Court provides in its jury instructions.

21    Third, Defendants argue that Clark improperly opines on ultimate issues of liability that

22    the jury should consider without experts intruding on the jury's province. Defendants specifically

23    fault Clark for stating that "Deputy Leenstra's use of lethal force in this case was based on a

24

1  subjective belief/fear and was never justified." (Mot. at 8.) But as the Court understands Clark's

2  report, he is not opining an ultimate jury issue. Rather, he provides his assessment of whether

3  Leenstra's use of force was reasonable and justifiable. This opinion does not improperly intrude

4  on the jury's role or opine on an ultimate issue of liability. And should this issue arise at trial,

5  Defendants are free to raise any objections.

6      Fourth, Defendants argue that Clark cannot testify about the effect of alcohol on Sarrett

7  and his ability to comply with Leenstra's demands. While Clark's opinion are potentially subject

8  to effective cross examination, he does have sufficient experience to discuss intoxication's

9  impact on the ability to communicate in the context of the facts of this case.

10     The Court therefore DENIES the Motion to Exclude both Hicks' and Clark's opinions.

**CONCLUSION**

12     Although the Court finds that Defendants are entitled to summary judgment on Plaintiff's

13  Fourteenth Amendment and Defendants' felony-bar affirmative defense to Plaintiff's state law

14  claims, the Court finds that material issues of fact prevent summary judgment on Plaintiff's

15  Fourth Amendment claims. A jury must resolve whether Leenstra violated Plaintiff's Fourth

16  Amendment rights. For these reasons, the Court GRANTS in part and DENIES in part

17  Defendants' Motion for Summary Judgment. And the Court DENIES the Motion to Exclude.

18     The clerk is ordered to provide copies of this order to all counsel.

19     Dated December 13, 2024.

20

21     Marsha J. Pechman
       United States Senior District Judge

22

23

24